No. 99,394

STATE OF KANSAS, *Appellee*, v. CORINTHIAN ISIAH BRICKER,
*Appellant*.
(252 P.3d 118)

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 13, 2009. Opinion filed June 3, 2011.

*Joanna Labastida,* of Kansas Appellate Defender Office, argued the cause, and *Lydia Krebs,* of the same office, was on the brief for appellant.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Sara Pfeiffer,* legal intern, *Phill Kline,* district attorney, and *Steve Six,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by:

NUSS, C.J.: Corinthian Bricker pled no contest to one count each of aggravated battery (a severity level 5 person felony), driving under the influence (a class B misdemeanor), and failure to present proof of insurance (a class B misdemeanor). Contrary to the plea bargain agreement that recommended sentencing to "Labette Bootcamp Probation," the district court sentenced Bricker to 36 months in prison on the felony charge and 180 days in jail on each of the misdemeanor charges, with all sentences to run concurrently.

After sentencing, Bricker filed a motion to withdraw plea alleging his counsel was ineffective for failing to learn before the plea that Bricker was actually ineligible for Labette. The district court denied the motion, and the Court of Appeals affirmed. We granted Bricker's petition for review under K.S.A. 20-3018(b) and now affirm.

## FACTS

In the early morning hours of June 21, 2005, Bricker was driving his Ford Ranger between 58 and 62 mph in a 35-mph zone when he broadsided Andrea Cunningham's Ford Explorer at an intersection in Lenexa. While Bricker was in the hospital, blood and urine samples were drawn. His blood alcohol level measured .22, and his urine indicated the presence of cocaine, marijuana, and barbiturates.

The State secured a search warrant for Bricker's truck and discovered a crack pipe. Police would later learn that Bricker was driving without any insurance. The State eventually charged Bricker with: (1) aggravated battery in violation of K.S.A. 21-3414(a)(2)(A) because of Cunningham's serious injuries; (2) driving under the influence in violation of K.S.A. 8-1567; and (3) operating a motor vehicle without insurance in violation of K.S.A. 40-3104(d), (g).

Bricker's counsel was Mark Furney. The Friday before his bench trial scheduled for the following Monday, March 6, Bricker entered into a written plea agreement with the State. Under its terms, Bricker agreed to plead no contest to all three charges and to pay a $500 fine on the DUI charge. He also agreed to pay restitution for Cunningham's vehicle and any of her medical bills not covered by "any available insurance." In return, the State agreed to join in a recommendation for "Labette Bootcamp Probation," *i.e.*, placement at Labette Correctional Conservation Camp (LCCC). In the alternative, the State agreed to recommend (1) the middle sentence in the applicable grid box for the felony; (2) 90 days in jail plus a $500 fine on the misdemeanor DUI; and (3) that all sentences run concurrent. The plea agreement appears to be silent on the specifics of the disposition of the misdemeanor insurance charge.

The March 6 bench trial was replaced by a hearing for the court to consider Bricker's plea. There, the judge advised Bricker that the parties' joint recommendation for LCCC was not binding on the court:

"[Court]: I have your plea agreement, Mr. Bricker. I want you to understand the court is not obligated or required to follow the recommendations in the plea agreement. They are simply recommendations to the court. You understand that?

"[Bricker]: Yes, I do, sir.

. . . .

"[Court]: . . . I know there is a recommendation to screen your case for possible placement at Labette. You understand the court does not have to place you at Labette? You understand that?
"[Bricker]: Yes, sir."

Bricker was further advised of the maximum sentences for all of his charges, and the court ultimately accepted his no contest plea.

On March 10, the court ordered Bricker screened for LCCC admission. Bricker would later learn that he was ineligible for admission because he was taking two different antidepressants. After receiving word of Bricker's ineligibility, Furney filed a motion for interpretation of plea the day before sentencing.

At sentencing on May 5, Furney argued that even though Bricker was ineligible for LCCC, the spirit of the plea bargain required treatment and probation. One plea agreement condition included "follow ADSAP [Alcohol and Drug Safety Action Program] recommendations," and next to the form's caption "Agreed Disposition," a handwritten checkmark appeared on the "Probation" line.

The State continued to formally recommend LCCC even though it was not an option. The State further contended that the form's Probation line was checked only because it was required for LCCC to be an option. Cunningham and her family testified that they supported LCCC and treatment but opposed probation.

The court then sentenced Bricker to the middle grid box sentence of 36 months' imprisonment on the felony charge of aggravated battery. It also sentenced him to 180 days in jail on each of the misdemeanor charges, with a $500 fine for the DUI charge, with all sentences to run concurrently.

On October 16, 2006, Bricker changed to counsel Jessica Travis, who filed a motion to withdraw his plea. The motion alleged Furney was ineffective because Furney (1) failed to determine whether Bricker would be eligible for LCCC; and (2) failed to negotiate an "alternative resolution should Mr. Bricker be rejected" by LCCC.

At the hearing on his motion, Bricker presented testimony of criminal defense attorney Jason Billam, who stated his policy was

to discuss LCCC eligibility with clients before accepting a plea bargain. Bricker also presented an affidavit from Furney, where Furney conceded that he "did not advise [Bricker] that because he was on certain medications, he in fact would not be accepted into [LCCC]."

According to Bricker's testimony, Furney never discussed with him "things that might disqualify" him from LCCC placement. Bricker testified Furney approached him the day before sentencing and stated that "he [Furney] screwed up and I wasn't able to get into boot camp, and Judge Davis was going to sentence me to prison the following day." Bricker testified that he also was never advised by counsel about the possibility of plea withdrawal until after sentencing or that the standard permitting withdrawal would then be higher.

Bricker admitted he understood from his earlier plea acceptance hearing that the judge was not required to sentence him to LCCC. He believed, however, there was a chance he would be sentenced to LCCC. He also admitted that although he had not been sentenced to LCCC, if the judge had instead "granted [him] probation . . . or let [him] go to some sort of drug and alcohol treatment program," he would not be attempting to withdraw his plea.

The district court denied Bricker's motion, concluding there was no manifest injustice as required under the plea withdrawal statute. The judge stated:

"So the question here is did Mr. Furney violate some standard of care such that it changed everything in your mind. And I listened to your testimony. I heard the fact that had you gotten a less restrictive probation, you wouldn't be here asking to have your plea withdrawn. You didn't get what you wanted. Not everybody at sentencing gets what they want. It's the judge's prerogative to pass the sentencing. I make determination[s] based on all the information, what is proper sentence in your case. And I did agree to give you a chance at Labette. I did not agree to give you a chance anywhere else. And Labette did not accept you.

"There is only one other door, and that is the prison door.

"So whether Mr. Furney failed to negotiate a fall-back position or told you about withdrawing your plea earlier, the point is, it is . . . in the final analysis up to the Court's good judgment and discretion, and I exercised that discretion by sending you to prison based on the information that I had in the case.

"I do not find there is manifest injustice shown here such that the plea should be withdrawn."

Bricker appealed and the Court of Appeals affirmed. *State v. Bricker*, No. 99,934, 2009 WL 743375 (2009) (unpublished opinion).

Additional facts will be added as necessary.

## ANALYSIS

Issue: *The district court correctly denied Bricker's motion to withdraw plea.*

### Standard of Review

Motions to withdraw pleas are governed by K.S.A. 2010 Supp. 22-3210(d)(1) and (2), which provide:

"(1) A plea of guilty or *nolo contendere,* for good cause shown and within the discretion of the court, may be withdrawn at any time before sentence is adjudged.

"(2) To correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw the plea."

The district court's decision to deny a postsentence motion to withdraw a plea is reviewed under an abuse of discretion standard. *State v. Beauclair,* 281 Kan. 230, 235-36, 130 P.3d 40 (2006). Bricker bears the burden to prove the district court abused its discretion. *State v. Sanchez-Cazares,* 276 Kan. 451, 454, 78 P.3d 55 (2003). A number of considerations comprise this standard, including review to determine that the discretion was not guided by erroneous legal conclusions. *State v. Gonzalez,* 290 Kan. 747,755-56, 234 P.3d 1 (2010); *State v. Skolaut,* 286 Kan. 219, Syl. ¶ 3, 182 P.3d 1231 (2008).

### Discussion

Bricker filed a postsentence motion to withdraw his plea, and K.S.A. 2010 Supp. 22-3210(d)(2) authorizes the district court to grant a defendant's motion only to correct manifest injustice. Kansas courts review at least three factors, commonly known as *Edgar* factors, after *State v. Edgar,* 281 Kan. 30, 127 P.3d 986 (2006), when considering whether a defendant has demonstrated the requisite manifest injustice. These are: (1) whether the defendant was represented by competent counsel; (2) whether the defendant was misled, coerced, mistreated, or unfairly taken advantage of; and (3) whether the plea was fairly and understandingly made. *Edgar,* 281

Kan. at 36; see *State v. Green*, 283 Kan. 531, 545-46, 153 P.3d 1216 (2007) (applying the *Edgar* factors to a postsentence plea withdrawal case); see also *State v. Aguilar*, 290 Kan. 506, 511, 231 P.3d 563 (2010) (collecting cases discussing the *Edgar* factors).

While the *Edgar* factors are "viable benchmarks for judicial discretion," we have made clear they should not be relied on to the "exclusion of other factors." *Aguilar*, 290 Kan. at 512. See *State v. Freeman*, 292 Kan. 24, 28, 253 P.3d 1 (2011).

As the sole basis for his postsentence plea withdrawal, Bricker argues ineffective assistance of counsel. Our recent opinion in *Aguilar* is of some assistance. There, the defendant filed a presentence motion to withdraw plea alleging ineffective assistance of counsel due to a concurrent representation conflict of interest. To show a Sixth Amendment violation, a claim of ineffective assistance of counsel based upon conflict of interest requires the defendant to show that the conflict affected the adequacy of the representation. See *Mickens v. Taylor*, 535 U.S. 162, 172-73, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). However, the *Aguilar* court refused to "equate the lesser K.S.A. 22-3210(d) good cause standard governing a presentence plea withdrawal motion to the high constitutional burden" required for Sixth Amendment purposes by *Mickens*. 290 Kan. at 513. In reaching its conclusion, the *Aguilar* court noted that it nevertheless "may be logical and fair to equate the K.S.A. 22-3210(d) manifest injustice standard governing a postsentence plea withdrawal motion to the high burden imposed on a constitutional claim of ineffective assistance." *Aguilar*, 290 Kan. at 513.

What we recently implied in *Aguilar*, we plainly express today. A defendant filing a postsentence motion to withdraw plea under K.S.A. 22-3210(d) that alleges ineffective assistance of counsel due to deficient performance must meet constitutional standards to demonstrate manifest injustice. See also *State v. Muriithi*, 273 Kan. 952, 955-56, 46 P.3d 1145 (2002) (applying constitutional standard to a postsentence plea withdrawal motion alleging ineffective assistance of counsel). Consequently, Bricker must meet the commonly known *Strickland* test and show that (1) Furney's perform-

ance fell below the objective standard of reasonableness and (2) there is a reasonable probability that but for Furney's errors, the result of the proceeding would have been different. See *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984); *Chamberlain v. State,* 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting *Strickland* standards); *Muriithi,* 273 Kan. at 955-56. A " 'reasonable probability' " is a probability sufficient to undermine confidence in the outcome. *State v. Gleason,* 277 Kan. 624, 644, 88 P.3d 218 (2004).

On appeal to this court, Bricker continues to argue Furney's performance was deficient because, before Bricker's plea entry, Furney (1) failed to familiarize himself with LCCC admission criteria and (2) failed to advise Bricker of those criteria. He now abandons his lower court contention that Furney was deficient for failing to negotiate a fallback plan and instead argues that Furney failed to inform him he could move to withdraw his plea before sentencing. This failure resulted in Bricker having to meet the "manifest injustice" standard instead of the lesser "good cause" standard. Although this two-fold argument was not stated in Bricker's written motion to withdraw plea, it was sufficiently raised at the hearing to allow its consideration on appeal.

*Failure to learn, and advise, of LCCC admission criteria*

Bricker first analogizes his case to *State v. Davis,* 277 Kan. 309, 85 P.3d 1164 (2004), to support his claim that the court should allow withdrawal of his plea to correct manifest injustice because of Furney's deficiencies regarding LCCC admission criteria. There, Davis' counsel based the defense on the ground that Davis was not able to "understand the nature and quality of his acts" and therefore was legally insane at the time of the crime. *Davis,* 277 Kan. at 325. Unfortunately, the defense of insanity or diminished capacity had already been abolished in K.S.A. 22-3220. Additionally, the defense's own expert witness eventually aided the State by opining that Davis did possess the mental capacity to form the requisite intent to commit the crime. As the *Davis* court stated, "Had counsel understood the correct legal standard to be applied, counsel would have attempted to secure an expert witness whose

testimony would not destroy the very defense he was attempting to establish." 277 Kan. at 328. The court concluded that defense counsel's actions were both deficient and prejudicial under *Strickland* entitling Davis to a new trial.

In a letter Bricker submitted pursuant to Supreme Court Rule 6.09 (2010 Kan. Ct. R. Annot. 48), he argues withdrawal of his plea to correct manifest injustice is also required by *Wilkinson v. State*, 40 Kan. App. 2d 741, 195 P.3d 278 (2008). Wilkinson was charged with possession of cocaine. While out on felony bond, he was arrested again and received a second charge of cocaine possession. Wilkinson pleaded guilty to the first charge and received probation with an underlying sentence of 28 months. Before his second charge proceeded to a plea, Wilkinson was picked up on a probation violation for failing a drug test.

Wilkinson eventually admitted his probation violation and agreed to plead guilty to the second charge of cocaine possession. In exchange, the State agreed to recommend that Wilkinson's sentences for both charges run concurrent. However, concurrent sentences were impeded by an obstacle that was "nearly insurmountable." 40 Kan. App. 2d at 745. Specifically, Wilkinson committed his second offense while he was out on felony bond for the first offense, and Kansas statutes require consecutive sentences in such situations unless that disposition "would result in a manifest injustice." See K.S.A. 21-4608(d) and K.S.A. 21-4720(a). The *Wilkinson* court acknowledged that a sentence results in manifest injustice only when it "is obviously unfair and shocks the conscience of the court." 40 Kan. App. 2d at 742 (citing *State v. Medina*, 256 Kan. 695, Syl. ¶ 1, 887 P.2d 105 [1994]). The district court ultimately imposed consecutive sentences.

Wilkinson filed a motion to withdraw plea that the district court denied without an evidentiary hearing. He essentially alleged his attorney was ineffective for failing to advise him of the manifest injustice requirement for the court to order concurrent sentences. The Court of Appeals panel held that Wilkinson could not make an informed decision without being advised of the requirements of K.S.A. 21-4608(d) and K.S.A. 21-4720(a):

"[I]n Wilkinson's case, a concurrent sentence could be given only if consecutive sentences would shock the conscience of the court, and that's more than a tilted playing field—the test is nearly insurmountable. Yet Wilkinson had every reason to believe that the odds were spread out evenly, not rising to the peak of a mountain. Wilkinson pled guilty in exchange for the State's recommendation of a concurrent sentence, but the manifest-injustice standard substantially undercut the value of that bargain. Wilkinson could not make an informed decision about that plea bargain without knowledge of this standard." *Wilkinson*, 40 Kan. App. 2d at 745.

The panel reversed the district court and remanded for an evidentiary hearing to determine whether Wilkinson's attorney, as alleged, did not tell him about the manifest injustice standard. If not, "then the attorney's performance fell below the standard of reasonableness." 40 Kan. App. 2d at 746.

We disagree with Bricker that his situation is sufficiently similar to those of the defendants in *Wilkinson* and *Davis* to require withdrawal of his plea to correct manifest injustice. In both those cases, defense counsel took positions that were clearly barred by statute or else contained statutory obstacles that were "nearly insurmountable."

In *Davis*, counsel was ineffective for advocating an insanity defense abolished by statute. Accordingly, we held counsel "did not adequately prepare for trial because, by his own admission, he was unaware of the proper *legal standard* for a defense of mental disease or defect." (Emphasis added.) 277 Kan. at 327.

Similarly, in *Wilkinson*, counsel plea bargained for concurrent sentences despite statutes requiring consecutive sentences unless that disposition "would result in a manifest injustice." Consequently, we held counsel was ineffective because his client "needed to know the applicable *legal standard* so he could intelligently evaluate this plea agreement." (Emphasis added.) 40 Kan. App. 2d at 746.

By contrast, Bricker's plea bargain was not statutorily barred. Nor did it contain an obstacle that was almost statutorily insurmountable. More specifically, his counsel did not fail to advise him of an applicable statutory or other legal standard. Furney's failure to familiarize himself with the factual admission criteria of the

LCCC and his failure to advise Bricker of those facts before Bricker's plea bargain simply do not approach that level.

Bricker's witness, Billam, did testify that the type of LCCC-related facts he discussed with his clients included whether they are mentally ill, have asthma or "anything that you are going to require medication," and whether they can meet the physical challenges such as sit-ups, push-ups, running, and "those types of things." However, the hearing transcript discloses that Billam was never offered as an expert witness, much less qualified as one by the defense, a designation which might authorize him to establish standards of performance for criminal defense attorneys. His personal practices, however exemplary, are insufficient for measuring Furney's performance under a claim of ineffective assistance of counsel. See *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984) (When criminal defendant complains of ineffectiveness of counsel's assistance, the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.); *cf. Bowman v. Doherty*, 235 Kan. 870, 879, 686 P.2d 112 (1984) (Expert testimony is generally required to establish the appropriate standard of care by which professional actions of attorney are measured in malpractice claim because such matter is outside knowledge of the average person.).

Additionally, the record reveals Bricker understood at all material times (1) his admission into LCCC was not guaranteed but depended upon LCCC's favorable screening; and (2) even if admitted to LCCC, he still was not *entitled* to have the court order him there. Bricker was clearly advised of these substantial risks when he affirmed his plea bargain with the court and, unlike the defendant in *Wilkinson*, was able to make an informed decision about it. As mentioned, the judge stated at Bricker's plea acceptance hearing:

"[Court]: . . . I know there is a *recommendation to screen your case for possible placement at Labette*. You understand the court does not have to place·you at Labette? You understand that?

"[Bricker]: Yes, sir." (Emphasis added.)

During the colloquy at the later plea withdrawal hearing, Bricker was asked about this earlier judicial reference to screening:

"[State Attorney]: What did you think it meant when the judge said, 'We're going to screen your case as a possible placement for Labette?'

"[Bricker]: I just would have said basically that I *had a chance to go.*

"[State Attorney]: A *chance* to go?

"[Bricker]: Yes, ma'am. I would be *screened to go.*

"[State Attorney]: *You knew it wasn't a done deal?*

"[Bricker]: *Somewhat, yes.*" (Emphasis added.)

The judge confirmed this understanding with Bricker at the same hearing: "You were screened for it [LCCC]. Screening by implication means you may or may not pass through. There is a possibility you don't go through." Indeed, Bricker's own witness testified that because many times defendants are not screened for LCCC until after they plead, he will, if possible, "negotiate alternatives *in case they do not get into boot camp.*" (Emphasis added.)

Under all of these circumstances, we cannot conclude that Furney's performance was constitutionally deficient. As a result, Bricker fails to meet the first prong of the *Strickland* test. Consequently, we need not consider the second *Strickland* prong: prejudice. See *State v. Gleason*, 277 Kan. 624, 649, 88 P.3d 218 (2004). Therefore we need not reach Bricker's "frustration of purpose" argument contending that without Furney's deficient performance, "Bricker would never have entered into a plea agreement of which placement at LCCC was the primary benefit."

Because Bricker has not met the high burden required under the 6th Amendment to show ineffective assistance of counsel, he has concomitantly failed to show the "manifest injustice" pursuant to K.S.A. 2010 Supp. 22-3210(d)(2) to justify withdrawal of his plea based upon Furney's deficiencies regarding LCCC admission criteria.

*Failure to advise of plea withdrawal option before sentencing*

Bricker briefly argues that "[c]ompounding Furney's failure to inform Mr. Bricker that he was presumptively ineligible for LCCC prior to entering the plea agreement is the fact that" upon learning of LCCC's rejection, Furney failed to inform Bricker of two more

points before sentencing. First, he could move to withdraw the plea. Second, he would be more likely to prevail in filing such a motion before sentencing, rather than after, because of the resultant change in the standard from good cause to manifest injustice.

In short, Bricker argues these two failures could impact our earlier *Strickland* analysis of Furney's performance regarding the LCCC admission criteria. More specifically, Bricker contends Furney caused him to lose the opportunity to have that particular performance judged on the lesser good cause standard. See *Aguilar*, 290 Kan. 506 (presentence motion to withdraw plea for ineffective assistance of counsel merely requires good cause, while postsentence requirement of manifest injustice requires meeting 6th Amendment standards). Bricker also appears to suggest these two failures are additional Furney performance episodes to be analyzed under *Strickland* to demonstrate manifest injustice—either aggregated with Furney's LCCC-related performance, or at least independently.

We begin by analyzing the two failures independently under *Strickland* to determine whether Bricker has met his burden to demonstrate manifest injustice. Under this analysis, Bricker must show that Furney's performance fell below the objective standard of reasonableness. If so, he must then show there is a reasonable probability that but for Furney's errors the result of the proceeding would have been different: Bricker would have then filed a motion to withdraw his no contest plea and would have insisted on proceeding to bench trial. See *Strickland v. Washington*, 466 U.S. at 687; *State v. Gleason*, 277 Kan. at 644; *State v. Muriithi*, 273 Kan. at 955-56.

Unlike the factual admission criteria for LCCC, the right to seek plea withdrawal, and the applicable legal standards, are statutory. See K.S.A. 2010 Supp. 22-3210(d); *Wilkinson v. State*, 40 Kan. App. 2d at 746 (if counsel indeed failed to advise client of statutory manifest injustice requirement for court to order concurrent sentences, "then the attorney's performance fell below the standard of reasonableness"). Moreover, with the disappearance of one of the factual premises upon which the plea bargain is based, it is reasonable to expect that a defendant would be advised of alter-

natives, *e.g.*, the right to seek plea withdrawal. Bricker's testimony is uncontroverted: Furney never so advised him.

The State argues it was nevertheless reasonable for Furney to believe he could convince the judge at sentencing to grant Bricker probation. For example, we have held: " 'A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Gleason*, 277 Kan. at 644 (citing *Chamberlain*, 236 Kan. at 657). We observe, however, that only one sentence of Furney's affidavit, and not the affidavit itself, is included in the record on appeal. Accordingly, there is nothing to suggest Furney even considered anything besides arguing probation, *i.e.*, that there was a strategic choice to be made from various options, including the filing of a plea withdrawal motion. Moreover, the failure to advise a defendant of such an important right is difficult to consider as a deliberately chosen strategy. *State v. Carter*, 270 Kan. 426, 441, 14 P.3d 1138 (2000) (decision to enter a plea of guilty or not guilty to a criminal charge is a fundamental constitutional right guaranteed to a defendant and lies solely with the defendant). See also *Rowland v. State*, 289 Kan. 1076, 1086, 219 P.3d 1212 (2009) (only criminal defendant can make choice of plea).

Accordingly, under these circumstances, Bricker has met his burden to demonstrate the deficiencies were not the result of Furney's strategic choices. See *Gleason*, 277 Kan. at 644. As we stated there, "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 277 Kan. at 644. As a result, we conclude Furney's performance was constitutionally deficient when he failed to advise Bricker of this important option and its accompanying good cause standard.

The prejudice prong of the *Strickland* test requires Bricker to show a reasonable probability that he would have filed a presentence motion to withdraw his plea and insisted on proceeding to bench trial had Furney advised him of this option. Based upon our

reading of the record on appeal, we conclude Bricker has not made this showing.

First, Bricker never testified that had Furney advised him of this option to file a presentence withdrawal motion he would certainly, or even probably, have done so. Indeed, the evidence strongly points the other way. In lieu of prison, the plea bargain provided for joint recommendation of LCCC. See K.S.A. 21-4603d(5) (6 months in LCCC residence while on probation plus 6 months additional probation upon release). It also required payment of restitution for all bills not paid for by any available insurance. In the alternative, the plea bargain recommended a sentence at the middle number on the grid box for the level 5 felony of aggravated battery (36 months) and a sentence of 90 days in jail and a $500 fine on the DUI, with all sentences to run concurrently. It does not specify the sentence for the insurance misdemeanor.

If Bricker had attempted to withdraw his plea, and been successful, he would have faced considerably worse with his criminal history score of "H." Technically, he could have received (1) the upper number in the aggravated battery grid box: 38 months imprisonment; (2) per statute, a maximum of 180 days in jail for the DUI plus $1000 fine; and (3) per statute, a maximum of 180 days in jail for the lack of insurance, or fine of $300-$1000. The sentences could have been served consecutively, resulting in a maximum of 38 months in prison, followed by 360 days in jail, or total consecutive incarceration of slightly more than 4 years.

Moreover, the evidence of Bricker's guilt was overwhelming. His blood alcohol level was .22, almost three times the minimum needed for proving DUI. See K.S.A. 8-1567(a)(1) (legal limit for blood alcohol concentration is .08). His urine revealed a mixture of three different drugs in his system, at least two of which were illegal. He drove a highway speed in the city of Lenexa and eventually broadsided the victim's car at an intersection. He was belligerent and combative: an officer and firefighter were forced to hold him down at the scene.

Bricker's victim, Cunningham, sustained a broken pelvis, a broken bone in her low back, a bruised heart, and a punctured lung. She also sustained damage to her liver, spleen, and kidneys. Cun-

ningham has scars on her abdomen, right leg, and neck and a metal rod inserted in her right arm. She additionally suffered memory loss and depression. Given her injuries and his conduct, we conclude the elements of a level 5 aggravated battery offense are easily met: "recklessly causing great bodily harm to another person or disfigurement of another person." K.S.A. 21-3414(a)(2)(A) and (b).

Second, once Furney advised Bricker of his LCCC ineligibility, that same day he filed a motion for interpretation of plea to argue for probation because it was "within the spirit of the plea agreement." It states in relevant part:

"On March 3, 2006, the State and the accused entered into a plea agreement. Line 3 of that agreement states: 'Parties make joint recommendation for Labette Bootcamp Probation.' At the bottom of the agreement under the sub-head 'AGREED DISPOSITION', the 'Probation' box is checked.

"Because Mr. Bricker is taking certain medications, he is medically un-qualified for the Labette bootcamp. *The accused believes the plea agreement clearly contemplated probation, and that it would be within the spirit of the plea agreement for the defendant to ask the court to consider other non-prison sentence alternatives in light of his disqualification from Labette for medical reasons.*

"However, the defendant does not want to be accused of breaking the plea agreement, and for that reason, the accused asks for the Court's guidance in interpretation on this issue." (Emphasis added.)

Consistent with the written motion, at sentencing Furney did ask for the plea agreement to be interpreted in "the spirit of the plea bargain" to allow for even lesser sanctions than LCCC: probation in this "border box" case and/or 6 months in a drug treatment center, the same time period as Bricker's required residence in LCCC. Furney also provided an Alcohol and Drug Safety Action Program evaluation strongly suggesting Bricker receive treatment providing that the evaluation was consistent with the plea agreement condition that the parties "follow ADSAP recommendations." He further noted that everyone at the hearing had testified they would like to see Bricker receive treatment. Furney additionally argued they had "bargained for probation," and screening for the therapeutic community was necessary "in order to live up to the terms of the plea agreement."

Bricker was present for the hearing, and in his later testimony at the plea withdrawal hearing, acknowledged hearing these Fur-

ney arguments. As mentioned, Bricker also later testified that had Furney successfully obtained probation, or some type of drug and alcohol treatment program, Bricker would not be attempting to withdraw his plea. Although not dispositive of the *Strickland* prejudice prong, Bricker's admission undermines his argument that once he learned he was ineligible for the plea-bargained LCCC, he would have moved to withdraw his plea to face trial—and probable incarceration.

Under these circumstances, we conclude there was no reasonable probability Bricker would have moved to withdraw his plea based upon his LCCC ineligibility and insisted on proceeding to trial had Furney actually advised him of this option. Instead, Bricker more likely would have approved of Furney's argument "in the spirit of the plea bargain" for treatment and probation without the accompanying harshness of LCCC.

We finally turn to the additional failures' impact on, or aggregation with, Furney's LCCC-related conduct. As noted, we held this conduct had not independently risen to a constitutional deficiency under *Strickland*. We agree with Bricker's implication that Furney's presentence failure to advise him of the option of filing a motion to withdraw—with its resultant heightened burden of proving manifest injustice—can itself be considered in the determination of whether manifest injustice now exists to warrant plea withdrawal. After all, the failures clearly increased the difficulty of Bricker's task.

However, this new "mixed" claim has the same problem as the claim based upon Furney's presentence failure to advise Bricker of the ability to file a motion to withdraw plea. As explained previously, under the circumstances of this case, there simply is no reasonable probability Bricker would have requested his plea to be withdrawn before the prison sentence was pronounced. As a result, Bricker has not proven the need to correct manifest injustice—still his statutory requirement, given the timing of his plea withdrawal motion—even when influenced by Furney's failure to advise him of the ability to file such a motion presentence. See *State v. Sanchez-Cazares*, 276 Kan. 451, 454, 78 P.3d 55 (2003).

The judgment of the Court of Appeals is affirmed. The judgment of the district court is affirmed.